UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                   )
GLENN E. SEBRIGHT,  Individually   )
and as a Parent, Guardian and      )
Next Friend of CAITLIN N. SEBRIGHT,)
and SUZANNE L. SEBRIGHT,           )
                  Plaintiffs,      )
                                   )
         v.                        )     CIVIL ACTION
                                   )     NO. 19-10593-WGY
GENERAL ELECTRIC CO., CBS          )
CORP., VELAN VALVE CORP.,          )
                                   )
                  Defendants.      )
_____)
```

YOUNG, D.J.                               March 11, 2021

## MEMORANDUM OF DECISION

### I.  INTRODUCTION

General Electric Co. ("GE"), GE's Mot. Summ. J., ECF No.
163; and Velan Valve Corp. ("Velan"), Velan's Mot. Summ. J., ECF
No. 166, each move for summary judgment contending it is not the
proper target of the asbestos litigation brought by Glenn E.
Sebright, individually and on behalf of his daughter Caitlin N.
Sebright, and his wife Suzanne L. Sebright (collectively,
"Sebright").  See Am. Compl., ECF No. 79.

Glenn E. Sebright is a former machinist mate in the United
States Navy ("Navy") who suffers from malignant mesothelioma, a
degenerative lung disease, as a result of asbestos exposure.
Id. ¶¶ 8-11.  Sebright has brought claims against numerous

corporations, including GE and Velan, that he alleges bear partial responsibility for his condition.  These claims are: negligence (count I) for failure to warn about the dangers of asbestos exposure, id. ¶¶ 12-18; breach of express and implied warranties (count II) because the corporations' products were not merchantable, safe, and fit for ordinary purposes due to their toxicity, id. ¶¶ 19-26; loss of parental society (count III) brought by and on behalf of Sebright's severely disabled daughter Caitlin Sebright, id. ¶¶ 27-29; and loss of consortium (count IV) brought by Sebright's wife, Suzanne Sebright, id. ¶¶ 30-32.

During the motion hearing held on November 10, 2020, the Court held that maritime law applies to the dispute at hand. Tr. Zoom Hr'g Held Nov. 10, 2020 ("Tr.") 27, ECF No. 213.  The Court also denied GE's summary judgment motion as to counts I and II, and in relation to the application of the government contractor defense.  Id. 25.  The parties were allotted additional time to brief the viability of Sebright's claims under maritime law for counts III and IV.  Id. 27.  After careful consideration of the parties' arguments and for the reasons set out below, the Court ALLOWS GE's summary judgment motion as to counts III and IV.

The Court ALLOWS Velan's summary judgment motion. For the reasons set out below, Sebright has failed to adduce evidence as

to an element of a cause of action for which he bears the burden
of proof at trial.   The Court thus does not reach counts II, III
and IV of Sebright's claims against Velan.   This memorandum of
decision explains the Court's reasoning.

## II.  Procedural History

### A.   Velan

Velan filed a motion and memorandum for summary judgment in
August 2020.   See Velan Mot. Summ. J.; Velan Mem. Supp. Mot.
Summ. J. ("Velan's Mem."), ECF No. 167.   Sebright filed an
opposition, and Velan filed a reply.   See Pl.'s Mem. Opp'n Mot.
Summ. J. ("Pl.'s Opp'n Velan"), ECF No. 174; Velan's Reply Pl.'s
Opp'n Velan's Mot. Summ. J. ("Velan's Reply"), ECF No. 181.
Velan has filed a statement of material facts.   See Velan's
Statement Undisputed Facts ("Velan's SOF"), ECF No. 168.
Sebright has filed its own statement of material facts, which
includes a "Statement of Additional Undisputed Material Facts."
See Pl.'s Resp. Velan's Statement Undisputed Facts ("Pl.'s SOF
Velan"), ECF No. 175.

### B.   GE

GE filed a motion and memorandum for summary judgment in
August 2020.   See GE Mot. Summ. J; GE Mem. Supp. Mot. Summ. J.
("GE's Mem."), ECF No. 164.   Sebright filed an opposition, and
GE filed a reply.   See Pl.'s Mem. Opp'n Mot. Summ. J. ("Pl.'s
Opp'n GE"), ECF No. 170; GE's Reply Resp. Mot. Summ. J. ("GE's

Reply"), ECF No. 182.  GE and Sebright both filed separate statements of material facts and Sebright included a "Statement of Additional Undisputed Material Facts."  See GE's Statement Undisputed Facts ("GE's SOF"), ECF No. 165; Pl.'s Statement Facts GE ("Pl.'s SOF GE"), ECF No. 171.

Following the hearing in this matter on November 10, 2020, the parties filed supplements to their oral arguments.  See GE's Suppl. Oral Arg. Mot. Summ. J., ECF No. 204; Pl.'s Resp. GE's Suppl. Oral Arg. Mot. Summ. J., ECF No. 210.

The parties also filed additional briefs relating to the viability of counts III and IV under maritime law. See Pl.'s Mem. Law Supp. Loss Consortium and Loss Parental Society Claims Under Maritime Law ("Pl.'s Mem. Supp."), ECF No. 209; GE's Mem. Law Supp. Dismissal Loss Parental Society Claim (Count Three) and Loss Consortium Claim (Count Four) ("GE's Mem. Opp'n"), ECF No. 208.

## III. Evidence

Extensive evidence has been adduced in this case, including numerous depositions of fact and expert witnesses.

### A.   Sebright's Evidence

Sebright relies on testimony provided by three fact witnesses.  In addition to his own deposition testimony provided on October 8 and 9, 2020, see Pl.'s SOF GE, Ex. 1, Videotaped Dep. Glenn E. Sebright ("Sebright Dep. I"), ECF No. 171-2; Pl.'s

SOF GE, Ex. 2, Videotaped Dep. Glenn E. Sebright ("Sebright Dep.
II"), ECF No. 171-3, Sebright relies on the testimony of a
former shipmate on the <u>USS Boston</u>, George Hiltz ("Hiltz"), <u>see</u>
Pl.'s SOF GE, Ex. 4, Videotaped Dep. George Hiltz ("Hiltz
Dep."), ECF No. 171-5, and on that of another former shipmate on
board the <u>USS Little Rock</u>, Michael Poulson ("Poulson"), <u>see</u>
Pl.'s SOF GE, Ex. 3, Videotaped Dep. Michael Poulson ("Poulson
Dep."), ECF No. 171-4.

Poulson, in addition to his factual testimony, also
purports to be an expert based on his experience in the ship
repair and asbestos remediation industry.  <u>See generally</u> Pl.'s
SOF GE, Ex. 5, Background & Op. Michael H. Poulson ("Poulson
Rep."), ECF 171-6.  As an expert, Poulson was deposed twice, on
June 5, 2020 and July 1, 2020.  <u>See</u> Pl.'s SOF GE, Ex. 6,
Videoconference Dep. Michael H. Poulson ("Poulson Exp. Dep. I"),
ECF No. 171-7; Pl.'s SOF GE, Ex. 7, Videoconference Dep. Michael
H. Poulson ("Poulson Exp. Dep. II"), ECF No. 171-8.  Velan filed
a <u>Daubert</u> motion to exclude Poulson's expert testimony on
November 6, 2020.  <u>See</u> Velan's Daubert Mot. Exclude Expert Test.
Report Michael Poulson, ECF No. 199.

Sebright's other expert witnesses are Dr. Candace Su-Jung
Tsai ("Tsai"), Brent Staggs, M.D. ("Staggs"), and David Rosner,
Ph.D. ("Rosner").

Rosner is a professor of public health and social history at the Columbia University Mailman School of Public Health.  See Pl.'s Mem. Opp'n Def. Air & Liquid Corp.'s Mot. Summ. J. ("Pl.'s Opp'n Air & Liquid"), Ex. F, Expert Report Gerald Markowitz PhD & David Rosner PhD ("Rosner & Markowitz Report") 2, ECF No. 132-7.[1]  Rosner's expert testimony focuses on the public and industrial health history of asbestos products in the United States.  Id.  Rosner was deposed on February 17, 2020 in the unrelated matter of Hailey v. Air & Liquid Sys. Corp., Civil Action No. DKC 18-2590, 2020 WL 4732141 (D. Md. Aug. 14, 2020), see GE's SOF, Ex. 45, Telephone Dep. David Rosner, Ph.D. ("Rosner Dep. I"), ECF No. 165-47, and, for the case at hand, on July 15, 2020, see Pl.'s SOF GE, Ex. 13, Videoconference Dep. David Rosner, Ph.D. ("Rosner Dep. II"), ECF No. 171-14.  Rosner has also authored a rebuttal report in relation to testimony provided by GE's expert witness, Captain Joselyn Senter.  See Pl.'s SOF GE, Ex. 47, Resp. Report Joselyn C. Senter ("Rosner Rebuttal"), ECF No. 171-48.  In a Daubert motion filed on October 14, 2020, GE challenged Rosner's opinions regarding GE's duty to warn sailors of asbestos hazards.  See GE's Rule 702 Daubert Mot. Exclude Expert Test. Dr. David Rosner, ECF No. 194.

---

[1] Sebright does not expressly rely on the Rosner & Markowitz Report in relation to GE's summary judgment motion.  It is available on the docket.

Tsai is an industrial hygienist who opined on Sebright's exposure to asbestos in a report dated December 23, 2019.  See Pl.'s SOF GE, Ex. 41, Asbestos Exposure Assessment Mr. Glenn Sebright ("Tsai Rep. with Add."), ECF No. 171-42.  Tsai amended her report on April 27, 2020.  Id. at 18-19.  Tsai also issued a rebuttal report on June 20, 2020 in relation to testimony provided by GE's expert, Captain Joselyn Senter.  See Pl.'s SOF GE, Ex. 48, Response to Report of Joselyn C. Senter ("Tsai Rebuttal"), ECF No. 171-49.  Tsai has been deposed three times: on June 11, 2020, see Pl.'s SOF GE, Ex. 8, Dep. Candace Su-Jung Tsai, MS, SCD, CIH ("Tsai Dep. I"), ECF No. 171-9, on July 9, 2020, see Pl.'s SOF Velan, Ex. 16, Dep. Candace Su-Jung Tsai, MS, SCD, CIH ("Tsai Dep. II"), ECF No. 175-17, and on July 21, 2020, see Pl.'s SOF GE, Ex. 10, Dep. Candace Su-Jung Tsai, MS, SCD, CIH ("Tsai Dep. III"), ECF No. 171-11.  Questioning the reliability of the scientific methods applied by Tsai in her report on December 23, 2019, Velan filed a Daubert motion to exclude her testimony on October 14, 2020.  See Velan's Daubert Mot. Exclude Expert Test. Report Dr. Candace Tsai ("Mot. Exclude Tsai"), ECF No. 193.

Staggs is a medical doctor and pathologist who opined on Sebright's diagnosis of mesothelioma in an expert report dated October 1, 2019, see Pl.'s Opp'n Air & Liquid, Ex. M, Reports

RE: Sebright, Glenn E. ("Staggs Report"), ECF No. 132-14,[2] and a supplemental report dated January 21, 2020, see Pl.'s SOF GE, Ex. 40, Reports RE: Sebright Glenn E. ("Staggs Supp. Rep."), ECF No. 171-41.  Staggs was deposed on June 3, 2020.  See Pl.'s SOF GE, Ex. 11, Videoconference Dep. Brent C. Staggs, M.D. ("Staggs Dep."), ECF No. 171-12.

**B.   GE's Evidence**

GE introduced expert testimony of its industrial hygienist, Captain Joselyn Senter ("Senter").  In his report dated November 17, 2016, Senter opined on the Navy's industrial hygiene history and programs during the relevant time period relevant.  See Pl.'s SOF GE, Ex. 45, Report Joselyn C. Senter, CIH ("Senter Rep."), ECF No. 171-46.  Senter was deposed on August 7, 2020. See Pl.'s SOF GE, Ex. 31, Dep. Joselyn C. Senter ("Senter Dep."), ECF No. 171-32.  GE also relies on a letter drafted by Senter on May 6, 2020.  See Pl.'s SOF GE, Ex. 46, Letter Re: Glenn Sebright v General Electric ("Senter Letter"), ECF No. 171-47.  Sebright filed a motion to strike Senter's testimony on September 4, 2020.  See Pl.'s Mot. Strike Expert Test. Joselyn C. Senter, ECF No. 172.

---

[2] Sebright does not expressly rely on the Staggs Report in relation to Velan's summary judgment motion.  It is available on the docket.

GE further relies on the testimony of former GE employee
Paul Banaszewski ("Banaszewski").  He opined on GE's steam
turbine design, manufacture, installation, operation, and
maintenance in an affidavit dated August 13, 2020, see GE's SOF,
Ex. 9, Aff. Paul A. Banaszewski ("Banaszewski Aff."), ECF No.
165-11, and a supplemental affidavit dated September 14, 2020,
see GE's Reply, Ex. 1, Supplemental Aff. Paul A. Banaszewski
("Banaszewski Supp. Aff."), ECF No. 183-1.  Banaszewski was
deposed on February 24, 2006, in the unrelated matter of French
v. Saberhagen Holdings, Inc., No. 07-2-28888-1, in the Superior
Court of Washington for King County.  See Pl.'s SOF GE, Ex. 15,
Dep. Expert Witness Paul Banaszewski ("Banaszewski Dep."), ECF
No. 171-16.

     **C.   The Expert Evidence**

Most of the expert witness evidence, including the
witnesses' individual expertise, has been challenged in various
reciprocal Daubert motions and motions to strike.  As the Court
stated during the November 10, 2020 hearing, these motions will
be considered at trial, see Tr. 29, but for the sake of
completeness, the Court will limn the expert testimony here,
though it expresses no opinion thereon.

The Rosner & Markowitz Report states that, by the 1930s, it
was well recognized in the industrial hygiene and occupational
health community that inhaling asbestos dust is hazardous.  See

Rosner & Markowitz Report at 11-17.   The problem was also known to industry, governmental agencies, and insurance companies at the time.   Id. at 18.   By 1955, the American Conference of Governmental Industrial Hygienists had adopted a toxic limit of five million particles of asbestos dust per cubic foot of air. Id. at 19-20 & n.53.   By the 1960s, the medical community was aware that asbestos exposure could cause lung cancer, mesothelioma, and other diseases.   Id. at 5.   Mesothelioma tumors occurring 20-40 years after asbestos exposure were also documented by the 1960s.   Id. at 31-32.   These rare tumors were known to affect even workers with "relatively light, intermittent, exposure to asbestos," including workers in the building trades who were exposed to asbestos incidentally in the course of their duties.   Id. at 33.

In his deposition for the instant case, Rosner stated that from 1967 to 1980, "any major organization of any significant size . . . would know that asbestos was a dangerous product." Rosner Dep. II at 48:8-49:13.   In his rebuttal report in response to Senter, GE's industrial hygienist, Rosner also stated that there is extensive documentary evidence that the Navy and GE were aware of the dangers associated with inhaling asbestos dust by World War II.   See Rosner Rebuttal at 2-3.

Staggs analyzed whether Sebright's mesothelioma was connected to his asbestos exposure.   See generally Staggs Supp.

Rep.  Staggs identified Sebright as having a significant history of asbestos exposure from his time in the Navy, primarily from inhaling asbestos-containing dust, as well as from his time as a heavy equipment operator after his discharge.  Id. at 4.  Staggs noted that mesothelioma is caused by the cumulative dose of asbestos exposure over a lifetime, so the greater the dose of exposure over time, the higher the chance of contracting the disease.  Id.  Staggs concluded that Sebright's mesothelioma was caused by asbestos exposure over his working lifetime but could not specify more closely the relative importance of contributing factors.  Id. at 5.

Tsai, who examined Sebright's records, testified that Sebright's asbestos exposure on board the two naval vessels would have often been thousands to millions of times higher than the background concentration.  Tsai Rep. with Add. at 13.  Most of Tsai's testimony is disputed.  See Mot. Exclude Tsai.  Tsai does not provide a quantitative assessment of Sebright's exposure to asbestos during his work in the Navy due to the lack of sampling data.  Tsai Dep. III at 545:5-15, 585:1-9.  She also does not provide a product-specific allocation of Sebright's exposure risk.  Id. at 589:1-24.

According to Poulson, the turbine insulation on the generator sets in the fire room of the USS Little Rock, which, like much of the coverings for the steam-driven equipment there,

[11]

was made of asbestos-containing material.  See Poulson Dep. at
84:24-85:17.  Poulson reports that at the time of his deployment
on the USS Little Rock, he was unaware of and unable to identify
asbestos products.  Id. at 69:6-12, 87:15-21.  He realized that
he had been exposed to asbestos after his discharge from the
Navy when he began working in the asbestos abatement industry.
Id. at 69:6-12, 91:3-14.  He then learned to recognize and
distinguish visually between different types of asbestos and
asbestos-containing products.  Id. at 85:4-24; Poulson Exp. Dep.
I at 171:4-172:1.  Poulson continued to work in the asbestos
abatement industry in various positions for 23 years, primarily
in shipyards on the west coast of the United States.  See
Poulson Dep. at 34:1-35:4, 85:4-88:1.  His work involved
asbestos removal and abatement from more than 100 Navy warships
of various sizes and descriptions.  Id. at 20:12-21:3, 213:16-
24.

**IV.  UNDISPUTED FACTS**

   **A.   Undisputed Facts as to Sebright**

   Sebright was diagnosed with malignant mesothelioma in April
2016.  See Pl.'s SOF GE, Ex. 38, Lab Results 4-5, ECF No. 171-
39. Mesothelioma is a disease of the lungs that is in most

cases fatal within 12 to 18 months following diagnosis.  Staggs
Dep. at 187:11-12.

Sebright enlisted in the Navy in 1968.  Sebright Dep. I at
58:4-58:17.  During his service for the Navy, he worked on two
different vessels, the USS Boston and the USS Little Rock.  Id.
at 64:6-65:4, 67:12, 108:22-109:5.

### 1.   On Board the USS Boston

Upon completion of his initial training, Sebright boarded
the USS Boston in October 1968 while the vessel was undergoing a
scheduled three-month overhaul at the Boston Naval Shipyard.
See id. at 64:8-65:19.

In May 1969, the USS Boston sailed to Vietnam to support
operations there, and it later returned to the United States.
Id. at 75:5-14, 100:7-12; Pl.'s SOF GE, Ex. 42, Military Service
Records ("Service Records") 2, ECF No. 171-43 (showing that
Sebright received the Vietnam Campaign Medal).  Between December
1969 and May 1970, the USS Boston was in the process of being
decommissioned at the Boston Naval Shipyard.  Sebright Dep. I at
100:14-21.  Sebright left the USS Boston in May 1970 and ended
his period of enlistment in November 1971.  Id. at 102:24-25,
107:8-9; Service Records 33.  Sebright reenlisted in August 1974
and served an additional two years on the USS Little Rock before
receiving an honorable discharge on September 14, 1976.
Sebright Dep. I at 107:22-108:7; Service Record 36.

[13]

While aboard the USS Boston, Sebright had the rank of fireman and was assigned to tend a particular generator in Fire Room 2 for the entirety of his stay.  See Sebright Dep. I at 65:22, 70:3-8.  There were four fire rooms on the ship, each sealed off from the others, but Sebright occasionally stood watch in the other fire rooms as well.  Id. at 69:1-2, 70:9-71:2.  Sebright's job as a fireman primarily entailed watching his generator and conducting scheduled maintenance work on it and the associated valves and pumps in regular intervals of approximately three months.  Id. at 75:15-77:11, 195:2-21.  Sebright's duties also included cleaning his workspace on and around his generator.  See Hiltz Dep. at 170:11-17.

Fire Room 2 of the USS Boston measured approximately 40 feet by 30 feet, comprising two levels separated by a mixture of grates and solid plating.  See Sebright Dep. I at 92:20-93:3; Hiltz Dep. at 70:4.  Sebright's equipment was located on both levels of the fire room.  See Sebright Dep. I at 93:5-93:15.  Temperatures in the fire room usually ranged between 100-110 degrees Fahrenheit, and the sailors were given salt tablets to prevent dehydration.  See Hiltz Dep. at 136:22-137:4.  Many pieces of equipment in the fire room were packed with asbestos as insulation.  Id. at 137:5-15.

Sebright did not perform any maintenance work on any equipment during the initial three-month overhaul of the USS

[14]

Boston.  See Sebright Dep. I at 71:4-72:3.  During the overhaul,

Sebright recalled being present in the vicinity while more

senior firemen performed maintenance work on his generator.  Id.

Their work included repacking valves and pumps associated with

Sebright's generator.  Id. at 72:4-73:15.  Sebright's duties

were primarily to clean up after them.  Id. at 71:21-72:3.

     In addition to his own deposition statement, Sebright

relies on deposition statements made by his shipmate, George

Hiltz.  See generally Hiltz Dep.  Hiltz attended to boiler

equipment in the same Fire Room Number 2 of the USS Boston as

Sebright between October 1968 and the end of 1969 or the

beginning of 1970.  Sebright Dep. I at 19:7-15, 94:6-8; Hiltz

Dep. at 48:13-50:20.  There was some overlap of shifts during

which Sebright and Hiltz worked in Fire Room 2 at the same time.

Sebright Dep. I at 94:9-18.  Hiltz estimates that the overlap in

concurrent shifts in Fire Room 2 was between 50% and 60% of the

time.  Hiltz Dep. at 68:1-8.

     Hiltz stated that he could not recall whether Sebright was

present for any particular repairs or maintenance work, but that

Sebright typically would walk around or work somewhere in the

room during many repairs.  Hiltz Dep. at 73:15-23.  Hiltz also

recalls that the air in Fire Room 2 was often thick with dust

particles that he believed to be asbestos, particularly when the

sailors conducted any type of maintenance on the pipes or

gaskets.  Id. at 137:16-138:22.  Hiltz further recalls that the sailors routinely would use knives and picks to cut through asbestos insulation when conducting repairs or maintenance on equipment.  Id. at 140:20-142:5.  This repair work released dust into the air, which the sailors inhaled.  Id. at 143:11-145:5; see Sebright Dep. I at 133:6-20.  Hiltz also noted that the air circulation blowers in the fire room "could have" recirculated dust from elsewhere on the ship into Fire Room 2.  Hiltz Dep. at 171:22-172:4; see Sebright Dep. I at 84:6-13.

During the vessel's decommissioning phase, Sebright's duties included cleaning his generator and preserving it. Sebright Dep. I at 100:14-101:12.  This work involved scraping paint off the exterior of the generator, cleaning its metal surface, and treating it with primer to limit corrosion.  Id. Sebright also described cleaning crevices between the generator, reduction gears, and the turbine, and draining and cleaning out the inside of a condenser unit associated with his generator. See Sebright Dep. II at 134:22-136:6.

### 2.   On Board the USS Little Rock

While on board the USS Little Rock, Sebright once again oversaw a fire room generator and stood watch in one of the vessel's engine rooms.  See Sebright Dep. I at 111:1-113:11. The fire room on board the USS Little Rock was slightly smaller than the one on the USS Boston.  Id. at 114:24-115:1-3; see

Sebright Dep. II at 188:18-20.  The room had two levels, an upper and a lower level.  See Poulson Dep. at 51:20-52:16. During his deployment on the USS Little Rock, Sebright held the rank of petty officer, but his maintenance duties were essentially the same as aboard the USS Boston.  Sebright Dep. I at 116:10-21.  Sebright recalls performing regular and preventative maintenance work on the generators in the USS Little Rock fire room.  See id. at 116:10-117:12.  His work also included repacking equipment and replacing leaking valves.  Id. at 117:13-119:6.  Sebright performed this work by cutting away insulation material to gain access to the leaking valve and by hammering gaskets to fit around pipes.  Id.  Sebright also recalls that to re-apply new insulation around replaced valves, he had to mix powdered insulating material with water.  Id. at 125:11-25.  He recalls that the bags containing the powder were made of clear plastic without any writing on them.  Id. at 125:21-126:4.  Handling the powder created dust.  Id. at 125:17-20.  Sebright describes this work as identical to that performed in Fire Room 2 on the USS Boston.  Id. at 117:15, 118:9-11, 125:24-25.

Poulson, Sebright's shipmate aboard the USS Little Rock, served as a boiler technician in the same fire room of the USS Little Rock as Sebright between mid- to late 1975 and the end of 1976.  See id. at 20:6-10; Poulson Dep. at 43:20-24, 44:6-25.

[17]

While on the <u>USS Little Rock</u>, Poulson recalls that Sebright worked as a machinist's mate, mostly on the upper level of the fire room, tending to two steam-driven turbine generators located there.  <u>See</u> Poulson Dep. at 50:1-17, 51:20-52:60. Poulson would work throughout the fire room.  <u>Id.</u> at 52:2-16. Poulson describes the fire room on the <u>USS Little Rock</u>, as well as the entire ship, as being in general disrepair.  <u>Id.</u> at 76:4-10, 78:22-79:8, 213:16-214:13.  He describes insulation material constantly falling off the equipment, requiring it to be picked up from the floor on a regular basis.  <u>Id.</u> at 78:22-24.  Poulson recalls that to perform certain maintenance tasks on equipment within the fire room, sailors had to stand or climb on the insulation applied around drain pipes and other equipment because there were no ladders in the fire room.  <u>Id.</u> at 72:10-74:6.

Sebright left the <u>USS Little Rock</u> in September 1976.  <u>See</u> Sebright Dep. I at 132:10-13.

**B.   Undisputed Facts as to GE**

GE manufactured the generator sets that were installed in the fire rooms of the <u>USS Boston</u> and the <u>USS Little Rock</u>.  <u>See</u> <u>id.</u> at 71:12-16, 113:14-17; Hiltz Dep. at 47:17-48:9; GE's SOF ¶ 1.  A generator set consists of a steam turbine and a generator unit, connected by a rotating shaft.  <u>See</u> Poulson Dep. at 164:8-18; Hiltz Dep. at 48:7-9; Banaszewski Aff. ¶ 10.  The purpose of

[18]

the generator sets was to convert thermal energy contained in steam that was produced in boilers into electricity for use on board the two vessels.  See Banaszewski Aff. ¶ 3.  GE's generator sets were installed into the USS Boston and the USS Little Rock upon construction of the vessels in the 1940s.  Id. ¶ 10.  GE delivered the generator sets to the Navy without heat insulation ("bare metal").  Id. ¶¶ 2, 5.

GE designed and manufactured the generator sets in accordance with specifications formulated by the Navy ("MILSPECs").  Id. ¶ 4.  MILSPECs contain very detailed requirements to ensure that the equipment will be suitable for wartime operations, and they are formulated with an emphasis on durability.  Id.; see Banaszewski Supp. Aff. ¶ 9.

According to Sebright and Poulson, the generator sets on board the USS Boston and the USS Little Rock were insulated with removable pads or covers.  See Sebright Dep. II at 208:2-22; Poulson Dep. at 174:4-176:9.  Only the turbine unit of the generator set required thermal insulation.  Poulson Dep. at 174:4-22.  Sebright remembers a removable cover that was strung around the turbine unit. Sebright Dep. II at 208:2-22.  Poulson also remembers that the pads were secured with lagging hooks and wire.  Poulson Dep. at 174:23-175:2.  According to Sebright, removable pads or covers were easier to handle and remove than having to mix and re-apply packing material each time the

generator set required maintenance.  See Sebright Dep. II at
208:2-22.

Poulson remembers that Sebright supervised but also
performed maintenance work on the two generators on the upper
level of the fire room on the USS Little Rock.  Poulson Dep. at
82:14-84:13.  This involved turning off one generator while
continuing to operate the other.  Id. at 84:02-84:13.  To access
the parts of the generator that required maintenance, the fire
room crew, including Sebright, would remove insulation pads from
the equipment and lay them on the ground.  Id. at 183:9-184:9.
When finished, the crew, including Sebright, would put the
generator parts back together and re-apply the insulation pads.
Id. at 83:18-84:12, 69:1-17.  Poulson describes the insulation
pads as being made of asbestos.  Id. at 69:1-12.

On the USS Boston, Sebright conducted scheduled maintenance
work on his generator and the associated valves and pumps.
Sebright Dep. I at 75:15-77:11, 195:2-21.  This work included
cutting away insulation material, replacing leaking valves, and
repacking equipment.  Id. at 117:13-119:6.

**C.  Undisputed Facts as to Velan**

Velan manufactures valves.  Pl.'s SOF Velan, Ex. 15; Dep.
Ewart Francois ("Francois Dep.") 22:6-22, ECF No. 175-16.  Ewart
Francois, a Velan representative, was deposed on June 30, 2011
in the unrelated matter of Hays v. A.W. Chesterton, Inc., E.D.

PA Civil Action No. 09-93728-ER.  See id. at 1.  Velan began

manufacturing valves in 1950, several years after the USS Boston

and the USS Little Rock were built and commissioned by the Navy.

Id. at 28:10-12; Banaszewski Aff. ¶ 10.

Valves on steam-powered vessels are disposable items that

are replaced frequently during operation of the vessel.  Poulson

Exp. Dep. II at 293:4-14.  A vessel includes a great number of

different types of valves for different purposes.  Id. at

308:11-310:13.  Whereas some types of valves require thermal

insulation to prevent a loss of thermal energy, other types,

such as fuel oil or potable water valves, do not.  Id.

Velan is not listed as a manufacturer for "major equipment

present during the construction and overhauls of the USS Boston"

in the ship's records.  See Velan's SOF ¶ 5 (citing Velan's SOF,

Ex. B, JRG Asbestos Research, ECF No. 168-2; Velan's SOF, Ex. C,

JRG Asbestos Research, ECF No. 168-3).  Sebright did not

identify Velan as a manufacturer of valves observed by him on

the USS Boston; he identified only Foster, Chapman, Rockwell,

and Copes.  See Sebright Dep. I at 72:16-20.

During his deposition as a fact witness, Poulson did not

identify Velan valves on board the USS Little Rock.  See

generally Poulson Dep.  In his expert report, however, Poulson

identified Velan as an equipment manufacturer for the USS Boston

and the USS Little Rock.  Poulson Rep. at 8.  In his deposition

as an expert, Poulson stated that he remembered working on equipment manufactured by the companies listed in his report. Poulson Exp. Dep. I at 90:6-22. Poulson reviewed the specifications of the USS Oklahoma City, a "sister ship" to the USS Little Rock, to confirm the list of equipment on the ship. See Poulson Dep. at 36:11-40:19. He then created a list of equipment manufacturers that he recalled from his work on the USS Little Rock. See Mem. Supp. Air & Liquid's Mot. Summ. J., Ex. E ("Poulson's List"), ECF No. 128-5.[3] This list does not include Velan. See id.

As an expert witness, Poulson testified that valves and other equipment bearing heat or steam on board the USS Boston and the USS Little Rock would have been insulated and sealed with asbestos-containing material when Sebright worked on them. See Poulson Exp. Dep. II at 308:8-310:13. Poulson further testified that he could not confirm which type of valves Velan would have supplied to the Navy for use on the USS Boston or the USS Little Rock. Id. at 314:3-11. Poulson also testified that he was unable to determine whether Velan sold any valves to the Navy that contained asbestos-containing gaskets or packing for use on the USS Little Rock or the USS Boston. Id. at 314:19-315:9.

---

[3] Velan does not rely on the content of Poulson's List for its arguments. Poulson's List is available on the docket.

Some Velan valves that were sold to the Navy contained asbestos components.  See Francois Dep. at 28:13-29:12.

The only source of evidence for the presence of Velan valves in Fire Room 2 on board the USS Boston is Hiltz's deposition testimony.  See Hiltz Dep. at 134:7-136:6.  During Velan's direct examination on valves, Hiltz testified that "Velan looked familiar."  Id. at 135:22.  Hiltz estimated that there were between 30 to 60 valves in Fire Room 2 of the USS Boston.  Id. at 134:7-136:6.  He further estimated that approximately one sixth of these valves, or approximately five to ten valves, were manufactured by Velan.  Id.  Hiltz testified that he saw Velan valves less often than other valves.  Id. at 135:22-24.  Hiltz also testified that approximately 75% of the valves in Fire Room 2, including the Velan valves, were re-packaged and re-gasketed while the USS Boston was in the Boston Naval Shipyard.  Id. at 149:18-150:6.  This work included the removal of valve insulation, including from Velan valves, to access leaking flanges.  Id. at 158:23-159:23.  According to Hiltz, he would use a knife to cut away insulation material.  Id.  Hiltz testified that this process created dust, which everyone working in the area would inhale.  Id.  Hiltz further testified that he hammered out gaskets on valves, including Velan valves, and that he believed that the resulting dust contained asbestos.  Id. at 165:13-169:2.

Hiltz also testified that Sebright worked within 15 to 40 feet of Hiltz's work and that Sebright had to walk across the boiler room space where Hiltz worked to get to his own workspace.  Id. at 154:23-155:24.

Tsai does not mention Velan in her expert report.  See generally Tsai Rep. with Add; see also Tsai Dep. III at 588:24-589:2; Tsai Dep. II at 247:21-248:7.  In her deposition testimony, Tsai also confirmed that she did not have any specific information regarding whether any equipment manufactured by any particular company, including Velan, contained asbestos.  See Tsai Dep. III at 456:10-16, 589:8-24; Tsai Dep. II at 246:16-248:17.

## V.   ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v.

<u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing <u>First</u> <u>Nat.</u>
<u>Bank of Ariz.</u> v. <u>Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

"[T]he plain language of Rule 56(c) mandates the entry of
summary judgment, after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient
to establish the existence of an element essential to that
party's case, and on which that party will bear the burden of
proof at trial." <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 322
(1986). "When the moving party has carried its burden under
Rule 56(c), its opponent must do more than simply show that
there is some metaphysical doubt as to the material facts."
<u>Matsushita</u>, 475 U.S. at 586. In determining the merits of a
summary judgment motion, "the court should review all of the
evidence in the record." <u>Reeves</u> v. <u>Sanderson Plumbing Products,</u>
<u>Inc.</u>, 530 U.S. 133, 150 (2000). "In doing so, however, the
court must draw all reasonable inferences in favor of the
nonmoving party, and it may not make credibility determinations
or weigh the evidence." <u>Id.</u>

**B.   Applicable Law**

In relation to the issue of substantial factor causation
and the applicable test for establishing exposure to asbestos,
Sebright appears to rely on Massachusetts law.[4] <u>See</u> Pl.'s Opp'n

---

[4] Sebright's reliance on Massachusetts law in his memorandum
in opposition to GE's motion for summary judgment contradicts

GE 2.  GE argues that maritime substantive law ought apply because Sebright's alleged injuries occurred aboard naval vessels in a manner that allows for federal maritime jurisdiction.  <u>See</u> GE's Reply 5-6.

At the November 10, 2020 hearing, the Court held that maritime law governs the dispute at hand.  <u>See</u> Tr. 27.

Maritime jurisdiction applies to personal injury claims if the alleged injury satisfies the "location" and "connection" tests.  <u>Jerome B. Grubart, Inc.</u> v. <u>Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 534 (1995).  The "location" test asks whether the injury occurred in or was caused by a vessel on navigable waterways, and the "connection" test asks whether the type of incident has a "substantial relationship to traditional maritime activity" and "a potentially disruptive impact on maritime commerce."  <u>Id.</u> (quotations omitted).  The location test is satisfied if some of the alleged asbestos exposure occurred on navigable waters.  <u>See</u> <u>Conner</u> v. <u>Alfa Laval, Inc.</u>, 799 F. Supp. 2d 455, 467 (E.D. Penn. 2011).  This requirement is met here

---

Sebright's arguments made in an earlier pleading filed in the instant case in response to a motion for summary judgment filed by Air & Liquid.  <u>Compare</u> Pl.'s Opp'n GE 2 <u>with</u> Pl.'s Opp'n Air & Liquid 3.  In his memorandum in opposition to Air & Liquid's motion, Sebright argued that maritime substantive law ought apply in this context because his injuries occurred aboard naval vessels in a manner that allows for federal maritime jurisdiction.  <u>See</u> Pl.'s Opp'n Air & Liquid 3 (citing <u>Jerome B. Grubart, Inc.</u> v. <u>Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 534 (1995)).

because at least some of the alleged exposure to asbestos
products occurred while Sebright was deployed at sea.  See
Sebright Dep. I at 75:5-24.  The connection test is also
satisfied because injuries incurred while conducting operations
and maintenance on a vessel bear a substantial relationship to,
and have a potentially disruptive impact on, maritime commerce.
See Lambert v. Babcock & Wilcox, Co., 70 F. Supp. 2d 877, 884
(S.D. Ind. 1999); Conner, 799 F. Supp. 2d at 465; John Crane,
Inc. v. Jones, 650 S.E. 2d 851, 854-55 (Va. 2007).  For example,
in Lambert v. Babcock & Wilcox, Co., the district court,
applying Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock
Co., 513 U.S. 527, held that maritime jurisdiction applied to
the case of a technician on a naval vessel who was exposed to
asbestos while working in the boiler room because the
maintenance of the boiler room was essential to the ship's
participation in maritime commerce.  70 F. Supp. 2d at 884.
Thus, this Court may exercise maritime jurisdiction over the
case.

     Generally, "[w]ith admiralty jurisdiction comes the
application of substantive admiralty law."  East River S.S.
Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986);
see Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 410 (1953)
(holding that admiralty substantive law applied in a case
originally brought in diversity, when the court also had

[ 27 ]

admiralty jurisdiction); In re Asbestos Prods. Liab. Litig. (No. VI), 873 F.3d 232, 235 (3d Cir. 2017); Conner, 799 F. Supp. 2d at 469 (concluding maritime law applied in three cases that had a sufficient maritime nexus and did not apply in a fourth that did not).

Admiralty law governs insofar as it conflicts with state law.  See Southern Pac. Co. v. Jensen, 244 U.S. 205, 216 (1917).  The "savings clause" of 28 U.S.C. § 1333, however, reserves "to suitors in all cases all other remedies to which they are otherwise entitled."  28 U.S.C. § 1333(1).  This clause has been interpreted to allow federal courts to apply state law remedies and causes of action under admiralty jurisdiction so long as they are not expressly contradicted by admiralty law.  See Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 214-16 (1996) (allowing application of state wrongful death remedy when federal law reserved the remedy to the states).

### C.    Count I: Negligence[5]

In count I, Sebright seeks damages for conscious pain and suffering based on the defendants' alleged failure to instruct and warn him of the dangers associated with the handling and use of the defendants' allegedly asbestos-containing products during his service on board the USS Boston and the USS Little Rock.

---

[5] Sebright chose not to advance a cause of action sounding in strict liability.  See Am. Compl. ¶ 4.

See Am. Compl. ¶¶ 12-18.  Sebright also claims that the defendants owed a continuing duty to instruct and warn him.  Id. ¶ 14.

Sebright's claim, as advanced, is a product liability claim.  Id. ¶ 4.  In duty-to-warn cases, courts consider causes of action sounding in strict liability and negligence as very similar, if not interchangeable.  See May v. Air & Liquid Sys. Corp., 129 A.3d 984, 998 (Md. 2015); In re N.Y.C. Asbestos Litig., 59 N.E. 3d 458, 475 n.7 (N.Y. 2016).

Maritime law has recognized principles of negligence and product liability.  See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 631–32 (1959); East River, 476 U.S. at 865.

To recover under a negligence theory, Sebright must demonstrate, inter alia, that GE had a duty to warn him of the dangers of asbestos posed by the equipment in the fire rooms of the USS Boston and the USS Little Rock that had been manufactured and supplied by GE to the Navy.  See In re N.Y.C. Asbestos Litig., 59 N.E. 3d at 469.  The question has been the subject of a recent Supreme Court decision in the maritime law context in Air and Liquid Systems Corp. v. DeVries, 139 S. Ct. 986 (2019).

### 1.   Duty to Warn

GE contends that there is insufficient evidence for a jury to infer that the factual bases for the requirements enumerated in DeVries are met.  See GE's Mem. 7-17.  Sebright disagrees. See Pl.'s Opp'n GE 7-19.

In DeVries, the Supreme Court considered the question of whether a manufacturer of a product has a duty to inform and warn of the dangers posed by a product in the maritime context if the dangerous elements were added to the product after the manufacturer delivered it to the customer.  139 S. Ct. at 991. The Supreme Court resolved a circuit split on this issue.  Id. at 992-93.  One line of reasoning adopted by some courts prior to the DeVries decision was to impose a duty to warn if it were foreseeable to a product manufacturer that its product would be used together with a dangerous element or other product.  See, e.g, Kochera v. Foster Wheeler, LLC, Case No. 14-CV-29-SMY-SCW, 2015 WL 5584749, *4 (S.D. Ill. Sept. 23, 2015); Chicano v. General Elec. Co., No. Civ.A. 03-5126, 2004 WL 2250990, *9 (E.D. Pa. Oct. 5, 2004).  The opposite approach was to impose no duty to warn if the product had been supplied to the customer "bare metal," i.e., without a dangerous element, and the dangerous element was added later by the customer.  See, e.g., Lindstrom v. A-C Prod. Liab. Tr., 424 F.3d 488, 492, 495-97 (6th Cir. 2005); Evans v. CBS Corp., 230 F. Supp. 3d 397, 403-05 (D. Del.

2017); Cabasug v. Crane Co., 989 F. Supp. 2d 1027, 1041 (D. Haw.
2013).  A third approach struck a middle ground between the two
others, providing that a product manufacturer has a duty to warn
if its product requires the use of dangerous elements and the
"manufacturer knows or has reason to know that the integrated
product is likely to be dangerous for its intended uses."
DeVries, 139 S. Ct. at 993-94; see, e.g., Quirin v. Lorillard
Tobacco Co., 17 F. Supp. 3d 760, 769-70 (N.D. Ill. 2014).

    In DeVries, the Supreme Court adopted the third, middle-
ground approach in the maritime law context and established a
new three-prong test ("the DeVries test") to determine whether a
manufacturer has a duty to warn of a dangerous product:

> In the maritime tort context, a product manufacturer
> has a duty to warn when (i) its product requires
> incorporation of a part, (ii) the manufacturer knows
> or has reason to know that the integrated product is
> likely to be dangerous for its intended uses, and
> (iii) the manufacturer has no reason to believe that
> the product's users will realize that danger.

139 S. Ct. at 995.  As in the instant case, the plaintiffs in
DeVries were Navy veterans who had served aboard Navy vessels
for several years before being diagnosed with cancer.  Id. at
991-92.  The defendants in DeVries, some of which were or are
still parties to the instant action, were manufacturers of
equipment which required asbestos-containing parts and
insulation to function properly.  Id. at 991.  The plaintiffs
claimed that their cancer was caused by exposure to the

manufacturers' asbestos-containing products while they were working on board Navy vessels.  Id. at 992.  As in the case at bar, the plaintiffs in DeVries advanced their claims under maritime tort law theories of negligence and product liability. Id. at 993.  For their part, some of the manufacturers relied on the "bare-metal defense," claiming that their products were supplied to the Navy free of asbestos-containing elements and that those elements were added to their product later by the Navy.  Id. at 991.  In rejecting the manufacturers' "bare-metal defense", the Supreme Court pointed out that a product manufacturer is in a better position to warn users of dangers associated with a product than a parts manufacturer, and that a duty to warn does not impose undue burdens on product manufacturers.  Id. at 994-95.

### a.   General Considerations

It is the role of the federal courts to fill the DeVries test with life and meaning when administering their maritime jurisdiction.  See Exxon Shipping Co. v. Baker, 554 U.S. 471, 489-90 (2008).

In its decision in DeVries, the Supreme Court expressly recognized the special responsibility of the federal courts for the welfare of seamen generally and for the Navy veterans and their families specifically.  See 139 S. Ct. 995; see also

Atlantic Sounding Co., Inc. v. Townsend, 557 U.S. 404, 417 (2009).

GE contends that the decision in DeVries is to be applied narrowly. See GE's Mem. 7; GE's Reply 11 & n.4. Sebright argues that the decision has a wider scope. See Pl.'s Opp'n GE 9.

Describing the decision as "tightly cabined," the Supreme Court in DeVries emphasized that its ruling "applies only in certain narrow circumstances": cases in which a product requires a dangerous element in order to function as intended. See 139 S. Ct. at 995. The Court did, however, clarify that the new rule also applies in "certain related situations, including" when a product requires replacement parts in the future and when a product would be useless without the part, "so long as the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and the manufacturer has no reason to believe that the product's users will realize that danger." Id. at 995-96. The use of the word "including" suggests that this list of additional circumstances is not exclusive. See id. at 995.

The fact that the three prongs of the newly established DeVries test are connected by the word "and" signifies that the requirements are cumulative, meaning that Sebright must establish all three prongs of the test at trial. See id.

### b.   Classification of Equipment and Whether it was Dangerous

The products at issue in the instant case are the turbine sets supplied by GE to the Navy for use in the fire rooms of the USS Boston and the USS Little Rock when the vessels were built in the 1940s.  See GE's SOF ¶¶ 1, 34, 35.  GE asserts that the turbine sets for both vessels were delivered to the Navy in a "bare metal" state, i.e., lacking exterior insulation.  See GE's SOF ¶ 1.[6]  It has not been established that the turbine sets contained interior asbestos components.  See Pl.'s SOF GE, Ex. 20, Dep. Under Oral Examination David Skinner ("Skinner Dep.") 92:9-93:7, ECF No. 171-21.[7]  It has been established, however, that the turbine elements of the GE generator sets were insulated with lagging pads.  See Sebright Dep. II at 208:2-22; Poulson Dep. at 174:4-176:9.

As a threshold issue, GE contends that Sebright failed to demonstrate that the lagging pads contained asbestos, i.e., that they are "dangerous" under DeVries.  See GE's Reply 6-7.  With respect to insulation pads applied to the GE turbine on the USS

---

[6] At Pl.'s SOF GE ¶ 1, Sebright contends that the generator sets were supplied with asbestos-containing packing, gaskets, or insulation.

[7] Contrary to Sebright's assertions in Pl.'s SOF GE ¶ 1, Skinner does not state that "all GE marine turbines had asbestos gaskets through at least the 1960s."  Skinner answers the same direct question once in the affirmative and once in the negative.  See Skinner Dep. at 92:9-93:7.

Boston, Sebright primarily relies on the purported expert testimony of Poulson, who stated that the steam turbine side of generator sets on Navy vessels was typically covered with asbestos insulation.  See Pl.'s Opp'n GE 5 (citing Poulson Exp. Dep. II at 396:9-22).  With respect to the insulation materials applied to the GE turbines on board the USS Little Rock, Sebright also relies on the testimony of Poulson who testified that the fire room crew, including Sebright, would remove insulation pads from the equipment and lay them on the ground. Poulson Dep. at 183:9-184:9.  When finished, the crew, including Sebright, would put the generator parts back together and re-apply the insulation pads.  Id. at 69:1-17, 83:18-84:12.

Because Sebright has made a "showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," see Celotex, 477 U.S. at 322, there is a genuine issue of material fact and summary judgment is not warranted on this issue.

### c.  Whether Products Require Incorporation of an Asbestos-Containing Part

GE contends that its turbines were delivered to the Navy without external insulation.  See GE's SOF ¶ 1.  GE and Sebright expend considerable effort in discussing whether GE's products "required" the use of asbestos-containing elements under the DeVries test.  See 139 S. Ct. at 995.

GE argues that in order to prove at trial that the GE generator set turbines "required" asbestos insulation, Sebright must demonstrate one of the following: (i) that GE directed the Navy to use asbestos lagging pads as insulation; (ii) that asbestos insulation was delivered together with the GE turbines; or (iii) that the turbines would be useless without asbestos insulation.[8]  See GE's Mem. 12-13; GE's Reply 12 (citing DeVries, 139 S. Ct. at 995-96).

With respect to element (i), GE contends that Sebright cannot show that GE directed the Navy to use asbestos lagging pads as insulation because all the equipment provided to the Navy by GE was designed and manufactured in accordance with MILSPECs, which originated with the Navy.  See GE's Mem. 12; GE's SOF ¶¶ 79-81.  Sebright argues that GE was able to challenge, revise, and negotiate changes to Navy MILSPECs.  See Pl.'s SOF GE ¶¶ 79-81.  In that regard, Sebright relies on the witness testimony of Everett Ratzlaff to demonstrate that GE had an impact on Navy specifications for equipment.  See id. ¶ 79 (citing Pl.'s SOF GE, Ex. 19, Dep. Everett Ratzlaff ("Ratzlaff Dep.") 101:1-102:10, ECF No. 171-20).  A review of that testimony, however, does not support Sebright's argument. Ratzlaff expressly states that influencing Navy specifications

---

[8] As discussed above, the list in DeVries, 139 S. Ct. at 995-96, is likely not meant to be exclusive.

was a rare and onerous process that, in the example provided by
Ratzlaff, took over a year.  Ratzlaff Dep. at 101:1-102:10.
Ratzlaff's testimony does not support Sebright's contention that
GE directed the Navy to use lagging pads that contained
asbestos, let alone any specific elements of equipment.

Lastly, with respect to element (iii), GE argues that the
applicable standard as to whether the GE turbine "required"
asbestos insulation is whether the turbine would be "useless"
without asbestos insulation.  GE's Mem. 12-13; GE's Reply 12
(citing DeVries, 139 S. Ct. at 995-96).  In this context, GE
contends that the generator sets would have been perfectly
operational without any, let alone asbestos-containing,
insulation.  GE's Mem. 12-13; GE's Reply 12.  Sebright contends
that DeVries does not require that a product be rendered
"useless" without a "required" part.  Pl.'s Opp'n GE 9.
Sebright further states that operating GE turbines without heat
insulation would result in the overheating of the units.  Id.
10.  In support, Sebright refers to the deposition testimony
provided by Banaszewski.  See id. (citing Banaszewski Dep. at
88:11-89:10).  Sebright fails to mention, however, that Skinner
stated in his deposition that operating a GE turbine of the same
kind as those at issue in this case without heat insulation
would be undesirable because there would be negative effects on
the efficiency of the unit due to heat loss and a loss of

response capability because of the development of internal rubs.
See Skinner Dep. at 83:18-85:18.  Skinner also confirmed that a
lack of external insulation would mean that the outside of the
unit would be extremely hot and pose a high risk of burn
injuries.  Id.

At the outset, the Court notes that, contrary to GE's
views, DeVries does not provide that the lack of a part must
render a product useless for that part to qualify as "required."
The reference in DeVries to the term "useless" was made to
clarify a number of "related situations" as examples that the
new rule is meant to encompass.  See 139 S. Ct. at 995-96.
Throughout the decision in DeVries, the Supreme Court emphasizes
that a part must be "required" for the product to function as
intended.  Id. at 991-96.  The Supreme Court's focus is
therefore on the circumstances and the purpose for which a
product is intended to be used.  This is very much in line with
the generally accepted underlying objective of product
liability, which is to protect the user from injury or damage
sustained while using the product for its intended purpose.
See, e.g., In re N.Y.C. Asbestos Litig., 59 N.E. 3d at 472.[9]  For

---

[9] The decision in In re New York City Asbestos Litigation
was based on New York state law and not maritime legal
principles.  See 59 N.E. 3d at 469.  It is, however, cited in
the DeVries decision as a basis for the Supreme Court's
formulation of its new test.  See 139 S. Ct. at 996.

the case at hand, this means that the proper inquiry under the
first prong of DeVries is whether the GE turbine could function
as intended, i.e., whether it could perform the purpose for
which it was intended, without heat insulation.   The parties
disagree about whether GE's turbines "required" heat insulation
that contained asbestos.   Compare GE's Mem. 12-13, and GE's
Reply 12, with Pl.'s Opp'n GE 9-10.   The proper inquiry under
the first prong of the DeVries test, however, is whether GE's
"product requires incorporation of a part."   See 139 S. Ct. at
995 (emphasis added).   The test does not require Sebright to
establish under prong one that the part be dangerous on its own.
See id.   Rather, DeVries requires that "the integrated product
is likely to be dangerous."   Id. at 996; see also In re N.Y.C.
Asbestos Litig., 59 N.E. 3d at 474 (stating that danger arising
from the combined use of the product, including the part at
issue, triggers the duty to warn).   It is therefore not
necessary, under prong one of DeVries, to discuss whether the GE
turbines would have "required" asbestos insulation and whether
alternatives to asbestos insulation materials were available at
the time.   The proper inquiry is whether the turbines "required"
heat insulation at all in order to function properly for their
intended uses.

Specifically, Sebright has adduced testimony from Hiltz,
Poulson, and Sebright himself, showing that operating the

generator sets without heat insulation would have rendered the fire rooms on the USS Boston and the USS Little Rock intolerable workspaces by increasing an already very high temperature to unbearable levels.  See Hiltz Dep. at 136:22-137:4; Sebright Dep. II at 180:1-9, 182:5-19; Poulson Dep. at 124:25-125:16, 212:18-214:13, 215:13-18.  The generator sets were intended to be operated in confined and isolated spaces aboard Navy vessels by Navy sailors.  See Poulson Dep. at 214:17-217:4.  Without heat insulation, GE's generator sets could not have been operated and maintained in the fire rooms on board the USS Boston and the USS Little Rock.  See Hiltz Dep. at 136:22-137:4; Sebright Dep. II at 180:1-9, 182:5-19; Poulson Dep. at 124:25-125:16, 212:18-214:13, 215:13-18.  Sebright has therefore adduced sufficient evidence to allow a reasonable factfinder to conclude that heat insulation was "required" to be applied to the exterior of the GE generator sets in order to allow them to be operated in their intended setting.

Since GE is contesting these issues, a genuine issue of material fact has been raised in relation to the first prong of the DeVries test, and summary judgment would be inappropriate.

### d. Whether the Manufacturer Knows or has Reason to Know That the Integrated Product is Likely to be Dangerous for its Intended Uses

The second prong of the DeVries test asks whether the manufacturer knew or should have known that the integrated

product is likely to be dangerous for its intended uses.  See
139 S. Ct. at 995.  Thus, the central question under prong two
is whether GE was aware that its products would be combined with
asbestos heat insulation for use in fire rooms on Navy warships.
See id.  It is important to note that the duty to warn in
product liability cases, whether based on strict liability or
negligence, is of a continuous nature.  See In re N.Y.C.
Asbestos Litig., 59 N.E. 3d at 472.  A manufacturer is therefore
required to warn of dangers that it becomes aware of subsequent
to the sale of its products.  Id.  It is also important to note
that prong two in DeVries requires knowledge that it is "likely"
that the integrated product is dangerous.  139 S. Ct. at 995.
It does not require a showing of certainty.  Id.

     GE contends that at the time the two vessels were launched
in the 1940s, GE would not have had reason to know that
maintenance on its equipment would cause asbestosis, lung
cancer, or mesothelioma.  GE's Mem. 14.

     The second prong of the DeVries test, however, does not
require knowledge of the likelihood of the occurrence of a
particular set of symptoms or diseases.  See 139 S. Ct. at 995.
It merely requires a showing of knowledge or reason to know of a
likely danger posed by the integrated product sold by a
manufacturer.  Id.

Sebright's expert witness Rosner offers testimony that there is extensive documentary evidence that the Navy and GE were aware of the dangers associated with inhaling asbestos dust by the time of World War II.  See Rosner Rebuttal 2.

GE claims, in this context, that MILSPEC MIL-I-16411 and other Navy specifications allowed the use of glass fiber and other heat insulation materials as a substitute for asbestos products.  See GE's SOF ¶¶ 85-86; GE's Mem. 13.  Since alternatives to asbestos products were available to the Navy to apply to GE's turbines, GE argues that it could not have known whether it would have been dangerous to work with or near its generator sets.  GE's Mem. 13.  Sebright contends that any substitute for asbestos-containing heat insulation material permitted in Navy specifications required some asbestos component.  Pl.'s SOF GE ¶¶ 85-86.

GE further contends that GE generator sets were designed and built to require as little maintenance, and therefore as little contact with asbestos-containing insulation materials, as possible.  See GE's Mem. 14-15; GE's SOF ¶¶ 94-96 (citing Banaszewski Aff. 11-12).  GE argues that, on this basis, it could not have known that its products would pose a danger to Navy sailors.  GE's Mem. 14-15.  In this context, Sebright has adduced evidence from Poulson, who testified that all equipment in the fire rooms, including turbine generators, required

periodic maintenance and repairs.  See Poulson Exp. Dep. II at
448:4-20.  Sebright also provided evidence relating to the
details of such maintenance and repairs for steam generator sets
provided to the Navy by GE.  See Pl.'s SOF GE ¶ 94 (citing Pl.'s
SOF GE, Ex. 18, Instruction Book 400-KW AC + 50-KW DC Ship's
Service Turbine-Generator Set ("Instruction Book") 26, ECF No.
171-19).

Sebright has raised a genuine issue of material fact in
relation to the second prong of the DeVries test.  See 139 S.
Ct. at 995.  Summary judgment is therefore inappropriate.

> **e.   Whether the Manufacturer has No Reason to
> Believe That the Product's Users Will
> Realize That Danger**

Under the third prong of the DeVries test, Sebright is
required to demonstrate that GE had no reason to believe that
the user of its generator set would realize the danger emanating
from the integrated product.  See 139 S. Ct. at 995.

As a threshold issue, it will be necessary to establish
whose awareness of any danger is material under the third prong
in DeVries -- in effect, who is the "user" to which prong three
refers.  See id.  In its original memorandum, GE advanced
arguments that revolved around whether GE had reason to believe
that the Navy would have or should have realized the danger.
See GE's Mem. 8-12.  In its later reply, GE then appears to have
adapted its position slightly to address any possible awareness

[43]

by "the Navy or its personnel." See GE's Reply 13-15.  Sebright

has argued from the outset that the test in prong three of

DeVries refers to Sebright's awareness as the "end user" of GE's

product.  See Pl.'s Opp'n GE 12.

Generally, product liability protects the user of a product

who may or may not be the initial purchaser.  See In re N.Y.C.

Asbestos Litig., 59 N.E. 3d at 470 (quoting McLaughlin v. Mine

Safety Appliances Co., 181 N.E.2d 430, 433 (N.Y. 1962)).  The

concept primarily protects the individuals who are likely to be

harmed by the product.[10]  See id.  In the instant case, the

persons most likely to come into contact with GE generator sets

were the equipment operators, not the Navy as an abstract

organization.  See Cabasug v. Crane Co., 988 F. Supp. 2d 1216,

1229 (D. Haw. 2013) (citing Mack v. Gen. Elec. Co., 896 F. Supp.

2d 333, 341 (E.D. Pa. 2012)).  Sebright, being one such

equipment operator, demonstrably had no knowledge of the

prevalence of asbestos at his workplace when he worked on board

the USS Boston and the USS Little Rock.  See Sebright Dep. II at

280:6-281:8; Sebright Dep. I at 169:22-24.

The above interpretation is problematic, however, as

Justice Gorsuch recognized in DeVries, 139 S. Ct. at 999

---

[10] Purely pecuniary interests that are not related to
physical injuries or loss of property can be addressed in breach
of warranty claims.  See East River, 476 U.S. at 874.

(Gorsuch, J., dissenting), and as GE contends in its reply, <u>see</u>
GE's Reply, 13-14.  How was GE to know what Sebright or any
other sailor on board the <u>USS Boston</u> or the <u>USS Little Rock</u>
might have known at the relevant time and how can this possibly
be demonstrated at trial?  GE argues that the test in prong
three in <u>DeVries</u> is "clearly an objective standard."  GE's Reply
14.  Presumably, this means that the "user" under <u>DeVries</u> is an
abstract concept, instead of a concrete person, perhaps
encompassing a certain class of sailors working with GE's
products in fire rooms on board Navy vessels at the relevant
time.

     This Court holds that the "users" under the third prong of
the <u>DeVries</u> test are any and all potential and actual operators
of specific products.  True, the test does not refer to specific
individual(s), as Sebright suggests.  <u>See</u> Pl.'s Opp'n GE, 12 &
n.78.  As discussed above, the contention that the Navy is to be
considered a "user" under prong three is equally unavailing.[11]

     Notwithstanding the above, the wording of prong three in
<u>DeVries</u> is somewhat confusing.  <u>See</u> 139 S. Ct. at 995.  First,

---

     [11] This appears to have been the basis of the discussion
relating to prong three in <u>DeVries</u> in <u>Hammell</u> v. <u>Air & Liquid
Systems Corp.</u>, Civil Action No. 14-00013 (MAS)(TJB), 2020 WL
5107478, at *7 (D.N.J. Aug. 31, 2020).  The court in <u>Hammell</u>,
however, did not opine on the interpretation of the term "users"
in prong three of the <u>DeVries</u> test.

all three prongs of the test are formulated in the present tense, see id., despite the fact that most events that would likely be relevant for its application occurred sometime in the past. This makes it difficult to determine whose knowledge at what point in time may be material under the test.[12]

Second, under the third prong of the DeVries test, Sebright is required to demonstrate that GE "has no reason to believe that the product's users will realize that danger." Id. As GE suggests, it seems sensible to consider the requirement not met if GE had any reason to believe that a Navy sailor, such as Sebright, was aware of the presence and dangers of asbestos at his workspace. See GE's Mem. 8.[13] As the prong is formulated, however, Sebright is required to demonstrate the absence of GE's reasons for believing. See DeVries, 139 S. Ct. at 995.

The origin of the three-prong test in DeVries lies in Section 388 of the Restatement (Second) of Torts,[14] which the

_____

[12] If the duty to warn under DeVries is a continuing duty, arguably what counts is GE's knowledge at all relevant times. DeVries makes no determination as to whether the duty to warn is a continuing duty.

[13] In its reply, GE confuses the requirements under the third prong of the DeVries test by contending that Sebright has "not proven that there was no reason for GE to believe that the Navy or its personnel would not realize the hazards of asbestos." GE's Reply 13 (emphasis added).

[14] Section 388 of the Restatement (Second) of Torts reads as follows:

Supreme Court appears to have adopted in part for the purposes
of formulating its new test.  See 139 S. Ct. at 993-94 (citing
Restatement (Second) of Torts § 388 (Am. L. Inst. 1965)).  This
is helpful for the Court's attempts to construe and apply the
DeVries test in the case at hand.

Much of GE's argumentation focuses on the Navy's awareness
of the dangers of asbestos at different points in time.  See
GE's Mem. 8-10; GE's SOF ¶¶ 36-65.  GE also places great
emphasis on a statement made by Rosner during his deposition to
show that it was reasonable for GE to assume that the Navy would
warn its sailors of the hazards of asbestos.  See GE's Reply 15;
GE's Mem. 10.  GE cites Rosner's testimony as follows: "General
Electric knew what the Navy knew and that they assumed the Navy
was doing the right thing."  GE's Mem. 10 (quoting Rosner Dep.

---

One who supplies directly or through a third person a
chattel for another to use is subject to liability to those
whom the supplier should expect to use the chattel with the
consent of the other or to be endangered by its probable
use, for physical harm caused by the use of the chattel in
the manner for which and by a person for whose use it is
supplied, if the supplier
a) knows or has reason to know that the chattel is or is
   likely to be dangerous for the use for which it is
   supplied, and
b) has no reason to believe that those for whose use the
   chattel is supplied will realize its dangerous
   condition, and
c) fails to exercise reasonable care to inform them of its
   dangerous condition or of the facts which make it likely
   to be dangerous.

II at 107:18-20).  GE further refers to Rosner's testimony that
GE "would have had a reasonable expectation that the Navy would
inform and protect sailors from dangers."  Id. (quoting Rosner
Dep. II at 111:21-112:2).  Sebright contends that both
statements were taken out of context and that Rosner did not in
fact purport to make these statements on behalf of GE, nor did
Rosner mean to make a statement regarding GE's understanding of
the information that the Navy may or may not have communicated
to its sailors.  See Pl.'s SOF GE ¶¶ 66-67.  Sebright contends
that Rosner's entire statements should be considered in their
full context, see id., which can be found at Rosner Dep. II at
106:10-107:21, 110:18-113:20.  Lastly, GE points to numerous
documents that it purports show GE's awareness of protective
measures that were introduced by the Navy in the 1970s to
protect "its personnel."  GE's Mem. 10-12 (citing GE's SOF ¶¶
68-76; GE's SOF, Exs. 35-43, ECF Nos. 165-37 to 165-45).  In
response, Sebright contends that these documents are not on
point and that the referenced passages are taken out of context.
Pl.'s SOF GE ¶¶ 68-76.

     By making the above arguments, GE effectively invokes the
"sophisticated purchaser" defense, which provides that "a
manufacturer or supplier of a product is absolved of liability
for any harm that comes to the ultimate end-user if . . . it was
reasonable for the manufacturer or supplier to rely on the

intermediary to warn the ultimate end user (e.g., the plaintiff or seaman/employee)." Mack, 896 F. Supp. 2d at 341. Whether the "sophisticated purchaser" defense applies in the maritime law product liability context is a matter of debate. See Stevens v. Foster Wheeler, LLC, C.A. No. 14-157S, 2016 WL 8577465, at *4 (D.R.I. Oct. 14, 2016); Mack, 896 F. Supp. 2d at 339-40. The court in Mack v. General Electric Co. ultimately rejected the application of the "sophisticated purchaser" defense in maritime law cases involving alleged exposure of maritime workers to asbestos. See 896 F. Supp. 2d at 343.

In the context of maritime law, cases involving asbestos exposure of Navy seamen give rise to special circumstances that require a careful balancing of interests. See id. at 342; May, 129 A.3d at 988. In the case at hand, this includes the fact that Sebright might not have recourse against anyone other than equipment manufacturers.[15] Seamen are considered "wards of admiralty." See Townsend, 557 U.S. at 417. It is a stated goal of maritime law to protect "those who are particularly

---

[15] Sebright did not advance a claim against the Navy presumably because of the Feres doctrine, which provides that the federal government is not liable under the Federal Tort Claims Act for injuries to servicemen arising out of or in the course of activity incident to military service. Feres v. United States, 340 U.S. 135, 146 (1950). The Court in DeVries also stated that all suppliers of asbestos components in that case were bankrupt. 139 S. Ct. at 992. It can be assumed that this is likely the case in the instant matter as well.

vulnerable to the perils of the sea as a result of their

employment." <u>Fisher</u> v. <u>Nichols</u>, 81 F.3d 319, 323 (2d Cir.

1996).  Instructive in this regard is the decision in <u>Mack</u>:

> [R]ecognition of a sophisticated purchaser defense
> would have two effects . . . .  [A]t least with
> respect to Navy seamen, it would have the effect of
> leaving them (and their survivors) with no remedy.
> This is because the sophisticated purchaser defense
> places the burden of warning (and accompanying
> liability for failing to warn) on the purchaser of the
> asbestos, which, in the case of Navy seaman, was the
> United States Navy.  As such, the recognition of a
> sophisticated purchaser defense under maritime law
> would have the effect of thwarting the primary aim of
> maritime law of protecting and providing remedies for
> those who work at sea.

896 F. Supp. 2d at 342.

Sebright has presented evidence that he was never warned

about the dangers of asbestos.  <u>See</u> Sebright Dep. II at 225:9-

226:16, 279:25-280:10.  Hiltz and Poulson made similar

statements in their depositions.  <u>See</u> Poulson Dep. at 69:6-12,

87:15-21; Hiltz Dep. at 72:5-11.  Sebright has also adduced

evidence indicating that both GE and the Navy were aware at the

time the <u>USS Boston</u> and the <u>USS Little Rock</u> were launched, and

when Sebright worked on board both vessels, that asbestos was

harmful to human health, <u>see</u> Rosner & Markowitz Report 17-18;

Rosner Dep. II at 48:1-51:14, and that, apparently, neither

chose to warn sailors like Sebright of its dangers, <u>see</u> Sebright

Dep. II at 280:23-281:8; Sebright Dep. I at 169:22-24.

Support for the views expressed in <u>Mack</u> can be found in the "Comment on Clause (b)" in section 388 of the Restatement (Second) of Torts, which reads:

> However, the condition, although readily observable, may be one which only persons of special experience would realize to be dangerous.  In such case, if the supplier, having such special experience, knows that the condition involves danger and has no reason to believe that those who use it will have such special experiences will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize.

Restatement (Second) of Torts § 388 cmt. cl. (b) (Am. L. Inst. 1965).  In "Comment on Clause (c)" in section 388 of the Restatement (Second) of Torts, the following is stated:

> Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them, and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result . . . .  [I]f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful.  Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character.

<u>Id.</u> cmt. cl. (c) (citations omitted).

The Supreme Court in <u>DeVries</u> alludes to a balancing of risks and burdens by stating that to issue a warning requires

relatively little effort compared to the cost of possible injuries suffered from the exposure to harmful products.  See 139 S. Ct. at 995 (balancing the "light burden on manufacturers" of providing a warning against the Court's "special solicitude for the welfare of those who undertake to venture upon hazardous and unpredictable sea voyages" (quotations omitted)).

Consequently, a balancing of risks and burdens ought take place under prong three of the DeVries test in each individual case.  The balancing ought include a weighing of the risk of harm posed by the integrated product to the user against the time, cost, and effort required of the manufacturer to warn the user directly of that risk.  Thus, if an integrated product creates a significant and non-obvious risk to a user's life or physical wellbeing, and if the manufacturer's burden of warning the user of that risk directly is slight, the user is to be presumed ignorant of the danger posed by the integrated product under prong three of the DeVries test, whether or not the user can be expected to be warned of the danger by the product's purchaser as well.

It will be for the jury to decide whether the balancing of risks and burdens in the case before this Court will give rise to such presumption.  An affirmative finding will effectively preclude the "sophisticated purchaser" defense as mounted by GE in this case.  The Court concludes that, in situations such as

that before it in the case at hand, the above amendment to prong
three of the DeVries test is necessitated by the federal courts'
overarching mandate to protect the interests of seamen in the
absence of applicable statutory law.  See Townsend, 557 U.S. at
417.

Here, Sebright's allegation that he had no knowledge of the
existence or danger arising from the presence of asbestos at his
workplace on board the USS Boston and the USS Little Rock has
not been challenged by GE.  See Sebright Dep. II at 280:23-
281:8; Sebright Dep. I at 169:22-24.  The same is true of
Sebright's evidence that Hiltz and Poulson lacked knowledge of
the dangers of asbestos at the time.  See Poulson Dep. at 69:6-
12, 87:15-21; Hiltz Dep. at 72:5-11, 166:9-24.  Sebright has
also adduced evidence indicating that both GE and the Navy were
aware at the time the USS Boston and the USS Little Rock were
launched, and when Sebright worked on board both vessels, that
asbestos was harmful to human health.  See Rosner & Markowitz
Report 17-18; Rosner Dep. II at 48:8-51:14.

On this basis, the Court rules that Sebright has adduced
sufficient evidence to raise a genuine dispute as to material
facts relating to the third prong of the DeVries test.  Drawing
every reasonable inference in favor of Sebright as the non-
moving party, see Reeves, 530 U.S. at 150, summary judgment is
inappropriate.

### 2.   Causation

GE contends that Sebright has not demonstrated that an adequate warning would have prevented Sebright's injuries.  See GE's Mem. 15-17.

A products liability plaintiff alleging failure to warn must prove that "the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury." Cruz-Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 276 (1st Cir. 2003) (quotation omitted).

Sebright stated that had he known about the dangers of asbestos he would have requested permission from his superiors to use personal protective equipment.  See Sebright Dep. II at 226:18-227:7.  Sebright also testified that he thought his request would have been granted.  Id.

GE contends that Sebright would have had to follow lawful orders as a sailor in the Navy during wartime, even if those orders had put him at risk of bodily injury.  See GE's Mem. 16-17; GE's SOF ¶ 98 (citing Sebright Dep. I at 59:16-60-19; Sebright Dep. II at 282:13-283:8; Hiltz Dep. at 27:20-28:8; Rosner Dep. II at 279:11-280:18; Poulson Dep. at 99:10-102:20).

Sebright responds that it was possible to do both things at the same time; he could have complied with lawful orders while wearing protective gear.  See Pl.'s Opp'n GE 17.  In addition, all the evidence to which GE refers deals with the chain of

command in the Navy and shows that a failure to follow orders would have resulted in disciplinary consequences.  See Sebright Dep. I at 59:16-60:19; Sebright Dep. II at 282:13-283:8; Hiltz Dep. at 27:20-28:8; Rosner Dep. II at 279:11-280:18; Poulson Dep. at 99:10-102:20.  The testimony does not, however, establish that Sebright ever received or would have received an order not to wear protective equipment when working in the fire rooms of the USS Boston and the USS Little Rock.

This divergence in evidence places the issue in controversy and gives rise to a genuine dispute as to a material fact. Summary judgment is therefore inappropriate.

### 3.   Substantial-Factor Causation

To prove negligence under maritime law, Sebright must show that there is a causal nexus between his exposure to GE's and Velan's products and his injury.  See Lindstrom, 424 F.3d at 492.[16]  To do so, Sebright must prove that "(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered."  Id.  "Total failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products

---

[16] DeVries abrogated Lindstrom, see 139 S. Ct. at 994. Because DeVries addresses only a manufacturer's duty to warn and the validity of the "bare metal defense" under maritime law, see 139 S. Ct. at 992, the "substantial factor causation" requirements imposed by Lindstrom remain applicable.

liability." <u>Stark</u> v. <u>Armstrong World Indus.</u>, 21 F. App'x 371, 376 (6th Cir. 2001).  "A mere 'minimal exposure' to a defendant's product is insufficient to establish causation." <u>Krik</u> v. <u>BP Am., Inc.</u>, E.D. Pa. Civil Action No. 11-63473-ER, 2012 U.S. Dist. LEXIS 88591, at *13 (E.D. Pa. May 15, 2012) (quoting <u>Lindstrom</u>, 424 F.3d at 492).  "As Lindstrom teaches, 'the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" <u>Krik</u> v. <u>Crane Co.</u>, 76 F. Supp. 3d 747, 753 (N.D. Ill. 2014) (quoting <u>Lindstrom</u>, 424 F.3d at 492 (quotations omitted)).  "[W]hat exposure constitutes 'minimal' as opposed to 'substantial' exposure depends on the particular circumstances of each case." <u>Cabasug</u>, 989 F. Supp. 2d at 1038.

> For example, evidence that [the plaintiff] worked on a vessel in which a Defendant's products were present, on its own, is insufficient to raise a genuine issue of material fact that [the plaintiff] was exposed to such products . . . .  Plaintiffs may, however, raise a genuine issue of material fact by presenting direct evidence that [the plaintiff] worked on (or, depending on the particular fact, near) the asbestos-containing components of specific products.  Alternatively, Plaintiffs may present circumstantial evidence of exposure by presenting evidence that the Defendant's products were prevalent on the vessels on which [the plaintiff] worked and that [the plaintiff] regularly worked on those types of products.  In this latter case, evidence of regarding the prevalence of a Defendant's product, combined with evidence of [the plaintiff's] regular duties, may support the reasonable inference that [the plaintiff] worked on a particular product.

Id. at 1037–38.

"To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162–63 (4th Cir. 1986).

### a. Velan

Sebright's claims against Velan are limited to alleged asbestos exposure from Velan valves in Fire Room 2 on the USS Boston. See Pl.'s SOF Velan ¶ 4. Thus, the issue of "substantial factor causation" is the only one raised by Velan in support of its motion for summary judgment. See Velan's Mem. 5–15; Velan's Reply 3–8. The central question as to Velan is therefore whether Sebright was exposed to a sufficient degree to asbestos contained within or combined with Velan's products during his work on the USS Boston. See Pl.'s SOF Velan ¶¶ 6–69. Sebright argues that there is sufficient evidence for a jury to infer that Velan's products contributed substantially to his exposure, Pl.'s Opp'n Velan 2–9, while Velan argues that there is insufficient evidence to support such an inference as matter of law, Velan's Mem. 5–15. For the below reasons, Velan prevails.

### i.   Use of Velan Products on Board the USS Boston

Velan argues that Sebright has been unable to show that Velan valves were used in Fire Room 2 when Sebright worked there.  See Velan's Mem. 7-8; Velan's Reply 7-8.  Specifically, Velan contends that Sebright cannot show that Velan valves were used on the USS Boston when the vessel was launched, as the company came into existence several years later.  See Francois Dep. at 28:10-12; Banaszewski Aff. ¶ 10.  Velan is also not listed as a manufacturer for "major equipment present during the construction and overhauls of the USS Boston" in the ship's records.  Velan's SOF ¶ 5 (citing Velan's SOF, Ex. B, JRG Asbestos Research, ECF No. 168-2; Velan's SOF, Ex. C, JRG Asbestos Research, ECF No. 168-3).  Sebright did not identify Velan as a manufacturer of valves observed by him on the USS Boston (he identifies Foster, Chapman, Rockwell and Copes).  Sebright Dep. I at 72:16-20.  Poulson mentions Velan in his report as a manufacturer of equipment for the USS Boston and the USS Little Rock.  Poulson Rep. at 8.  In his deposition, Poulson stated that he remembered working on equipment manufactured by the companies listed in his report.  Poulson Exp. Dep. I at 90:6-22.  Poulson's List -- a document listing equipment manufacturers that he recalled from his work on the USS Little Rock -- does not include Velan.  See generally Poulson's List.  Sebright's only fact witness to identify Velan valves in Fire

Room 2 on board the USS Boston is Hiltz.  See generally Hiltz
Dep.  During Velan's direct examination on valves, Hiltz
testified that "Velan looked familiar."  Hiltz Dep. at 135:22.
Hiltz estimated that there were between 30 to 60 valves in Fire
Room 2 of the USS Boston.  See Hiltz Dep. at 134:7-136:6.  He
further estimated that approximately one sixth of these valves
were Velan valves.  Id.  Hiltz testified that he saw Velan
valves less often than other valves.  Id. at 135:22-24.

Sebright's evidence in support of his claim that he was
exposed to asbestos through Velan's valves on board the USS
Boston is, at best, borderline to establish sufficiency under
the applicable legal standards.  "[A] mere showing that
defendant's product was present somewhere at plaintiff's place
of work is insufficient."  Lindstrom, 424 F.3d at 492 (citing
Stark, 21 F. App'x at 376).  On the other hand, Hiltz remembers
working on Velan valves.  Hiltz Dep. at 134:7-136:6.  The fact
that the likely quantity of Velan valves is based on an estimate
should not distract from the fact that Hiltz confirms the
presence of Velan valves in Fire Room 2 of the USS Boston when
Sebright worked there with Hiltz.  See id.  Drawing all
reasonable inferences in favor of Sebright as the nonmoving
party, see Reeves, 530 U.S. at 150, Sebright has adduced just
enough evidence to give rise to a genuine material factual
dispute, see Fed. R. Civ. P. 56(a).

[59]

### ii.   Whether any Velan Valves on Board the <u>USS Boston</u> Contained Asbestos

Velan further challenges Sebright's evidence by stating that Sebright is unable to show that any Velan valves in Fire Room 2 on board the <u>USS Boston</u> contained asbestos.  <u>See</u> Velan's Reply 7-8.  Sebright has been able to establish that some Velan valves that were sold to the Navy contained asbestos components. <u>See</u> Francois Dep. at 28:13-29:12.  The evidence also shows that valves on steam-powered vessels are disposable items that are replaced frequently during operation of the vessel.  <u>See</u> Poulson Exp. Dep. at II 293:4-14.  Poulson also confirmed that a steam-powered vessel typically includes a great number of different types of valves for different purposes.  <u>Id.</u> at 308:11-310:13. While some types of valves require thermal insulation to prevent a loss of thermal energy, other types, such as fuel oil or potable water valves, do not.  <u>Id.</u>

Tsai does not mention Velan in her expert report.  <u>See generally</u> Tsai Rep. with Add.; <u>see also</u> Tsai Dep. III at 588:24-589:2; Tsai Dep. II at 247:21-248:7.  In her deposition testimony Tsai confirmed that she did not have any specific information regarding whether any equipment manufactured by any particular company, including Velan, contained asbestos.  <u>See</u> Tsai Dep. III at 456:10-16, 589:8-24; Tsai Dep. II at 246:16-248:17.  Poulson testified that equipment, including valves, bearing heat or steam on board the <u>USS Boston</u> and the <u>USS Little</u>

Rock at the time would have been insulated and sealed with
asbestos-containing material.  Poulson Exp. Dep. II at 308:8-
310:13.  Poulson further testified, however, that he could not
confirm what type of valves Velan would have supplied to the
Navy for use on the USS Boston or the USS Little Rock.  Id. at
314:3-11.  Poulson also testified that he was unable to
determine whether Velan sold any valves to the Navy that
contained asbestos-containing gaskets or packing for use on the
USS Boston or USS Little Rock.  Id. at 314:19-315:9.

Based on the above, Sebright has been unable to show that
the valves Hiltz identified as Velan valves contained asbestos.
To infer that they likely did would be to assume an element of
Sebright's claim, which he is required to demonstrate at trial.
On the basis of the adduced evidence, however, Sebright cannot
show at trial that the Velan valves Hiltz identified in Fire
Room 2 of the USS Boston contained any asbestos.  Hiltz stated
in his deposition that he could not identify asbestos at the
time he worked for the Navy and that he did not know then that
asbestos was harmful.  Hiltz Dep. at 137:22-138:7.  Poulson, who
may or may not be able to make this determination on the basis
of his expertise in the asbestos abatement trade, is not a fact
witness on this issue because he has never been on board the USS
Boston.  See Poulson Exp. Dep. I at 35:13-14.  Drawing all
possible inferences in Sebright's favor, see Reeves, 530 U.S. at

150, the adduced evidence is insufficient to create a genuine issue of material fact, see Fed. R. Civ. P. 56(a), and summary judgment is appropriate.

### iii. Whether Sebright had Sufficient Contact with Velan Products

Lastly, Velan contends that Sebright has failed to adduce enough evidence to establish that Sebright's contact with Velan valves was a "substantial factor" in causing Sebright's mesothelioma. See Velan's Mem. 5-15; Velan's Reply 5-7. Hiltz testified that an estimated 75% of the valves in Fire Room 2, including the Velan valves, were re-packaged and re-gasketed while he was working in Fire Room 2. See Hiltz Dep. at 149:18-150:6. This work included the removal of insulation on valves, including Velan valves, to access leaking flanges. Id. at 158:23-159:23. According to Hiltz, he would use a knife to cut away insulation material. Id. Hiltz testified that this process created dust, which everyone working in the area would inhale. Id. Hiltz further testified that he hammered out gaskets on valves, including Velan valves, and that he believed that the material that became airborne during that process contained asbestos. Id. at 165:13-169:2. Hiltz estimates that the overlap in concurrent shifts between him and Sebright during their deployment in Fire Room 2 on the USS Boston was between 50% and 60% of the time. Id. at 68:1-8. Hiltz further testified that Sebright worked within 15 to 40 feet of Hiltz's

workspace and that Sebright had to walk across the boiler room
space where Hiltz worked in order to get to his own workspace.
Id. at 154:23-155:24.

Tsai stated that to determine the asbestos exposure risk of
a bystander, she would require information as to the bystander's
proximity to the work performed, the nature of the work
performed, the duration of the work, whether the work is
performed in a confined space and whether any valves at issue
contained asbestos-containing gaskets and packing.  See Tsai
Dep. III at 590:10-601:21.  As discussed above, the last element
on this list is unavailable from the adduced evidence.  Tsai
confirmed this in her deposition, stating that none of this
information was available to her in order to allow her to opine
as to whether Sebright may have been exposed to asbestos from
work performed on any Velan valves.  Id. at 614:17-618:06.

Staggs stated that a bystander's exposure risk is
determined on the basis of information regarding the bystander's
proximity to the work that is being performed and the frequency
and regularity with which the proximity occurs.  See Staggs Dep.
at 155:4-162:3.  He stated that, generally, bystander exposure
is less than direct exposure and that an exposure risk decreases
if proximity to the work at issue decreases.  Id. at 157:18-20.
Staggs further stated that the information which he reviewed in
relation to Sebright's work on and in proximity to asbestos-

containing products was adequate for him to conclude that
Sebright's exposure was sufficiently substantial and significant
to cause his malignant mesothelioma.  See id. at 156:15-157:4;
Staggs Supp. Rep. at 5.  Again, as for Tsai's expert opinion,
for Staggs' views to be applicable to Velan valves, the evidence
would have to contain sufficient grounds to allow an assumption
that the specific valves at issue contained asbestos.  Sebright
has been unable to make this showing.

As stated above, a theoretical or mere "'minimal exposure'
to a defendant's product is insufficient" to establish
causation.  Lindstrom, 424 F.3d at 492.  "[T]he evidence
illustrating the factual controversy cannot be conjectural or
problematic; it must have substance in the sense that it limns
differing versions of the truth which a factfinder must
resolve."  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d
5, 8 (1st Cir. 1990) (quoting Mack v. Great Atl. & Pac. Tea Co.,
871 F.2d 179, 181 (1st Cir. 1989)).  Here, no two different
versions of the truth are presented.  Sebright's evidence is
missing an element.

Therefore, even resolving every doubt in favor of Sebright
as the nonmoving party and construing the evidence in the light
most favorable to Sebright, see Reeves, 530 U.S. at 150, the
evidence simply is not sufficient to overcome Velan's summary
judgment motion.  Sebright cannot establish that exposure to a

Velan valve containing asbestos was a substantial factor in causing his mesothelioma, and his evidence does not allow a factfinder to decide in his favor with respect to his claims against Velan.  See Liberty Lobby, 477 U.S. at 248.  Sebright cannot show what kind of valves Hiltz identified as being Velan valves, which is important to establish whether any such valve would have contained asbestos.  Sebright therefore failed to make a showing sufficient to establish the existence of an element essential to his case at trial.  See Celotex, 477 U.S. at 322.  On this basis, summary judgment is appropriate on Velan's motion, ECF No. 166.

### b.   GE

The central issue as to GE is whether Sebright was exposed sufficiently to asbestos contained within or combined with GE's products during his work on either the USS Boston or the USS Little Rock.  See Pl.'s SOF GE ¶¶ 1-33.  Sebright argues that there is sufficient evidence for a jury to infer that GE's products contributed substantially to his exposure, see Pl.'s Opp'n GE 2-7, while GE argues that there is insufficient evidence to support such an inference as matter of law, see GE's Mem. 3-7.

i.   **Whether the Generator Insulation Pads Contained Asbestos**

GE contends that Sebright cannot establish that the insulation pads on the GE generator turbines contained asbestos. See GE's Mem. 4; GE's Reply 6-7.

With respect to insulation pads applied to the GE turbine on the USS Boston, Sebright relies primarily on the expert testimony of Poulson, who stated that the steam turbine sides of generator sets on all Navy vessels at the relevant time were typically covered with asbestos insulation.  See Pl.'s Opp'n GE 5 (citing Poulson Exp. Dep. II at 396:9-22, 455:16-456:2).  With respect to the insulation materials applied to the GE turbines on board the USS Little Rock, Poulson testified that the fire room crew, including Sebright, would remove insulation pads from the equipment and lay them on the ground.  See Poulson Dep. at 183:9-184:9.  When finished, the crew, including Sebright, would put the generator parts back together and re-apply the insulation pads.  Id. at 69:1-17, 83:18-84:12.  Poulson learned to identify asbestos products after he left the Navy and joined the asbestos abatement trade.  Id. at 69:6-12, 85:4-24, 87:15-21; Poulson Exp. Dep. I at 171:4-172:1.  Poulson stated that he learned to differentiate between types of asbestos on the basis of exterior color.  Poulson Exp. Dep. II at 390:21-391:24.  He also stated that his previous preliminary identifications of asbestos samples have been confirmed "by bulk analysis, by

[66]

industrial hygienists, 100 percent of the time.  I've never been wrong.  Ever."  Id. at 391:21-24.  Even if Poulson does not qualify as an expert under Federal Rule of Evidence 702 and his opinions are limited to his own observations and Federal Rule of Evidence 701, his testimony permits a reasonable inference in Sebright's favor, which creates a genuine dispute as to a material fact on the issue of whether the lagging pads contained asbestos.

### ii.  Whether Sebright Performed Work in Proximity to Generators

GE further contends that Sebright failed to demonstrate that he performed any work on or near either the generator sets at issue or their insulation during his work on the USS Boston and on the USS Little Rock.  GE's Mem. 4-5.  Sebright has, however, adduced evidence that he was present during maintenance work on his generator performed by more senior firemen during the initial overhaul period on board the USS Boston.  See Sebright Dep. I at 71:4-72:3.  The senior firemen's work included repacking valves and pumps associated with "his" generator set.  Id. at 72:10-73:11.  Sebright's primary duties were to clean up after them.  Id. at 71:21-72:3.  Sebright also testified that he conducted preventative maintenance work on the generator set and the associated valves and pumps on a regular basis.  Id. at 75:15-77:11, 195:2-21.  Sebright's duties also included the cleaning of his workspace on and around the

generator set.  Hiltz Dep. at 170:5-15.  Again, with respect to
the insulation materials applied to the GE turbines on board the
USS Little Rock, Sebright relies on the witness testimony of
Poulson who testified that the fire room crew, including
Sebright, would remove insulation pads from the equipment and
lay them on the ground.  See Poulson Exp. Dep. II at 183:9-
184:9.  When finished, the crew, including Sebright, would put
the generator parts back together and re-apply the insulation
pads.  Id. at 69:1-17, 83:18-84:12.  Sebright testified that he
had to remove the lagging pads on the turbine units of his
generator set about four times a year to conduct regularly
scheduled preventative maintenance.  Sebright Dep. II at 193:1-
194:17.  He stated that "it always had a heavy layer of dust
under there."  Id. at 193:12-13.  He also testified that the
dust became airborne and that he inhaled it.  Id. at 193:14-18.
The above evidence raises enough of an inference to create a
genuine dispute as to a material fact on the issue of whether
Sebright worked on or near the insulation material associated
with the GE generator set on both the USS Boston and the USS
Little Rock.

### iii. Sufficiency of Asbestos Exposure

Lastly, GE contends that Sebright failed to establish that
his work on or near the generator sets exposed him to asbestos

to a degree sufficient to be a substantial factor in causing his injuries.  See GE's Mem. 6-7.

Sebright stated that he inhaled dust from underneath asbestos insulation lagging on the GE generator turbine at least about four times per year.  See Sebright Dep. II at 193:1-194:17.  Assuming that this occurred only on board the USS Little Rock, where Sebright was deployed for two years between November 1974 and 1976, Sebright Dep. I at 20:12-13, 109:1, this particular exposure occurred at least eight times.  This evidence alone raises an inference of more than minimal exposure.  See Lindstrom, 424 F.3d at 492.

GE further contends that Sebright's expert evidence is insufficient to establish "substantial factor causation" under Lindstrom.  See GE's Mem. 6-7; GE's Reply 11.  Sebright has adduced evidence from Tsai, who stated that Sebright's asbestos exposure on board the two naval vessels would have been thousands to millions of times higher than the background concentration.  See Tsai Rep. with Add. at 13.  Due to the lack of sampling data, however, Tsai does not provide a quantitative assessment of Sebright's exposure to asbestos during his work in the Navy.  See Tsai Dep. III at 545:5-15; 585:1-9.  She also does not provide a product-specific allocation of Sebright's exposure risk.  Id. at 589:1-24.  Sebright's expert witness Staggs stated that the information which he reviewed in relation

to Sebright's work on and in proximity to asbestos-containing products was adequate for him to conclude that Sebright's exposure was sufficiently substantial and significant to cause his malignant mesothelioma.  Staggs Supp. Rep. at 5; Staggs Dep. at 156:15-157:4.

The above evidence raises a genuine issue of fact as to whether Sebright was exposed to GE's asbestos-containing generator set, and whether this exposure was a substantial factor in causing his mesothelioma.  Summary judgment on this issue is therefore inappropriate.

### D.    Count II: Breach of Express and Implied Warranties

In count II, Sebright seeks to recover for breach of express and implied warranties, asserting that GE's products were not merchantable, safe, suitable, or fit for their ordinary purposes due to their toxicity.  See Am. Compl. ¶¶ 19-26.

Neither GE nor Sebright raise any independent arguments in their briefs related to count II, and no additional facts are addressed by the parties.

On this basis, GE's motion for summary judgment relating to count II of Sebright's complaint is DENIED.

### E.    Counts III and IV: Loss of Parental Society and Loss of Consortium

Sebright further claims loss of parental society in count III, brought on behalf of Sebright's severely disabled daughter

Caitlin Sebright, see id. ¶¶ 27-29, and loss of consortium in count IV, brought by Sebright's wife Suzanne Sebright, id. ¶¶ 30-32.

The issue whether loss of consortium and loss of parental society claims are available remedies under maritime law principles (and whether or to what extent state law applies) was discussed during the November 10, 2020 hearing, but no ruling was made by the Court. See Tr. 19:21-20:8. The parties were invited to file, and subsequently did file, supplemental briefs on the issue. See Pl.'s Mem. Supp.; GE's Mem. Opp'n.

This Court held in Horsley v. Mobil Oil Corp., 825 F. Supp. 424 (D. Mass. 1993), aff'd, 15 F.3d 200 (1st Cir. 1994), on the basis of the Supreme Court's decision in Miles v. Apex Marine Corp., 498 U.S. 19 (1990), that loss of consortium claims are precluded in personal injury actions by Jones Act[17] seamen, see Horsley, 825 F. Supp. at 427. The Court further decided that the same result applies to parental consortium claims and claims that are based on general maritime law principles rather than the Jones Act. Id. at 427 n.4. (citing Murray v. Anthony J. Bertucci Constr. Co., 958 F.2d 127, 132 n.3. (5th Cir. 1992)). Lastly, the Court decided that if a corresponding remedy is available under state law, it must not be applied to contradict

_____

[17] These actions are brought pursuant to 46 U.S.C. § 30104.

maritime law principles.  Id.  In this jurisdiction, therefore, state law remedies are unavailable to spouses and dependents of injured seamen under Massachusetts state law, since the general maritime law does not permit them.  Id.

Sebright argues that this approach is inapposite in the present factual setting, following the Supreme Court's decision and reasoning in Atlantic Sounding Co. v. Townsend, 557 U.S. 404 (2009).  See Pl.'s Mem. Supp. 2-7.

Sebright places much reliance on Townsend, applying its reasoning analogously to the facts of the present case.  See id. at 5-7.  In Townsend, the Supreme Court decided that punitive damages for willful and wanton disregard of maintenance and cure obligations are available as matter of general maritime law because they existed in tandem with and outside the scope of the Jones Act remedies.  557 U.S. at 424.  The Supreme Court in Townsend, however, expressly distinguished the facts of the case from those in Miles.  See id. at 420-22.  Miles therefore remains good law, and with it, this Court's decision in Horsley.

Sebright further points out that Miles involved Jones Act claims, whereas Sebright expressly does not seek remedies under the Jones Act.  Pl.'s Mem. Supp. 3.  On this basis, Sebright argues that because he seeks remedies under a product liability cause of action that exists independently within maritime law, the Townsend principles ought apply here.  Id. at 3-5.

The Court sees no reason to depart from an established line of precedent in Horsley that is unimpaired and, above all, on point.  As matter of stare decisis, this Court is bound by the First Circuit's affirmance of its own decision in Horsley.  See generally 15 F.3d 200.  The cases cited by Sebright which expressly allow loss of consortium claims under general maritime law, applying the Townsend approach, are not binding on this Court because they originate in other federal circuits.  See generally Morgan v. Almars Outboards, Inc., 316 F. Supp. 3d 828 (D. Del. 2018); Barrette v. Jubilee Fisheries, Inc., No. C10-01206 MJP, 2011 WL 3516061 (W.D. Wash. Aug. 11, 2011).

The Supreme Court decision in Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, which allows the application of state law remedies "for the wrongful deaths of nonseafarers in territorial waters," id. at 215, is distinguishable from the matter before the Court.  As discussed in the applicable law section above, see supra section V.B., because Sebright allegedly incurred his injuries while conducting operations and maintenance on a vessel, maritime law applies in this case.  See Lambert, 70 F. Supp. 2d at 884; Conner 799 F. Supp. 2d at 465; John Crane, 650 S.E. 2d at 854-55.  Sebright cannot, therefore, be considered a "nonseafarer," and Calhoun is distinguishable from the present case on this basis.

Accordingly, counts III and IV are not cognizable under general maritime law.  The Court therefore ALLOWS GE's summary judgment motion as to those counts.

### F.   Government Contractor Defense

GE claims that Sebright's claims against it are barred by the government contractor defense under the requirements established in <u>Boyle</u> v. <u>United Technologies Corp.</u>, 487 U.S. 500, 512 (1988).  <u>See</u> Answer Am. Compl. GE 20, ECF No. 83.[18]  "The government contractor defense . . . generally immunizes government contractors from civil liability arising out of the performance of federal procurement contracts."  <u>Bailey</u> v. <u>McDonnell Douglas Corp.</u>, 989 F.2d 794, 797 (5th Cir. 1993).  For GE to obtain summary judgment based on this defense, GE must demonstrate that: (1) the Navy approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) GE warned the Navy about the dangers in the use of the equipment that were known to GE but not to the Navy.  <u>Boyle</u>, 487 U.S. at 512.

Since GE is moving for summary judgment on an affirmative defense upon which it bears the burden of proof at trial, it must demonstrate "the absence of a genuine issue of material

---

[18] The defense is labeled "Seventy-First Affirmative Defense," but ought have been labeled "Seventy-Second Affirmative Defense."

fact as to all three (3) prongs of the Boyle test." See Willis

v. BW IP Int'l Inc., 811 F. Supp. 2d 1146, 1157 (E.D. Pa. 2011).

As a threshold issue, Sebright contends that the government

contractor defense does not apply in failure to warn situations.

Pl.'s Opp'n GE 17-19.  Specifically, Sebright argues that Boyle

was a design defect case, and therefore, the rationale that led

to the establishment of the three-prong test therein does not

apply.  Id. 18.  In support of his contention, Sebright relies

on Holdren v. Buffalo Pumps, Inc., 614 F. Supp. 2d 129 (D. Mass.

2009) (Gertner, J.).[19]  See id.  Contrary to Sebright's argument,

however, Holdren does not preclude the application of the

government contractor defense -- it merely modifies it.  See 614

F. Supp. 2d at 142.  "In order for a contractor to avoid

liability, the decision not to warn must be the government's,

not the contractor's, and it must reflect a federal interest

incompatible with the important health and safety requirements

of state law."  Id. at 137.  Under the adapted standard,

according to Holdren, the contractor in failure to warn cases

must demonstrate that: "(1) the government issued reasonably

precise specifications governing warnings; (2) the contractor

provided the warnings required by the government; and (3) the

contractor warned the government about dangers in the

---

[19] The decision in Holdren was made in the context of a
motion for remand.  614 F. Supp. 2d at 135.

equipment's use that were known to the contractor but not to the government." Id. at 142 (citing Hilbert v. McDonnell Douglas Corp., 529 F. Supp. 2d 187, 198 (D. Mass. 2008) (Gertner, J.)). In addition, Holdren holds that a manufacturer must show under prong one of the adapted standard that:

> [T]he federal government issued reasonably precise specifications covering warnings -- specifications that reflect a considered judgment about the warnings at issue.  Short of this, the manufacturer must show either back-and-forth negotiations over the warning or "some extrinsic evidence that the government exercised independent judgment" in such a way as to preclude the warning.

Id. at 143 (quoting Hilbert, 529 F. Supp. 2d at 199).  The contractor must show "that the government exercised its discretion in connection with the warnings in some meaningful way."  Id.  "Put differently, under Boyle, for the military contractor defense to apply, government officials ultimately must remain the agents of decision."  In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 630 (2d Cir. 1990).  A showing that the government had general control over the project is insufficient, see In re Katrina Canal Breaches Litig., 620 F.3d 455, 461 (5th Cir. 2010), as is mere "rubber-stamping" of a contractor's decision, see Trevino v. General Dynamics Corp., 865 F.2d 1474, 1486 (5th Cir. 1989).

     In support of its claim regarding the applicability of the government contractor defense, GE offers evidence in the form of

Banaszewski's testimony regarding the level of involvement of the Navy in the design and manufacture of its equipment by GE. See Banaszewski Aff. ¶ 4.  The referenced passage does not, however, speak to any Navy requirements relating to warnings. See id.

Sebright invokes the MIL-I-15024 §3.4.1.7. specification to support his contention that the Navy required manufacturers to include warnings on the products manufactured for them, and therefore, that it was GE's independent decision not to supply warnings on its products.  Pl.'s Opp'n GE 19 (citing Pl.'s Opp'n GE, Ex. 32, Interim Military Specification Identification Plates 4, ECF No. 171-33).  In contrast, testimony provided by former GE employee Ratzlaff appears to suggest that the Navy generally did not require GE to provide warnings with its equipment and that the Navy would have rejected warning labels because it wanted to train its own sailors.  See Ratzlaff Dep. at 148:7-149:11.  GE also refers to a copy of a photograph of a Navy maintenance card from 1974 that had been on board a different World War II vessel (the USS Sperry) as proof that the Navy exercised its discretion as to whether to warn sailors of the dangers of asbestos.  See GE's Reply 17-18 (citing GE's Reply, Ex. 4, Navy Maintenance Card, ECF No. 183-4).

On the basis of the above evidence, GE is unable to demonstrate that there is no genuine issue of material fact as

to the elements of the government contractor defense that it is required to prove at trial.  Summary judgment is therefore inappropriate.  Moreover, as Sebright has not squarely admitted those elements and the jury is free to disbelieve GE's evidence even though unrebutted, see Reeves, 530 U.S. 133 at 150-51, summary judgment cannot issue.

## VI.  CONCLUSION

In conclusion, the Court DENIES GE's summary judgment motion, ECF No. 163, as to counts I and II and in relation to the application of the government contractor defense, and ALLOWS GE's summary judgment motion as to counts III and IV.

The Court ALLOWS Velan's motion for summary judgment, ECF No. 166.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE